Let's just wait and let everyone get settled. And while we do that, Your Honor, I've printed out some of the policy provisions that are at issue just on a sheet for the Court's convenience if I might approach and… You can give that to the clerk and they'll distribute it to us. Thank you. Okay. Thanks. Okay. Okay, Mr. Hudson. If it may please the Court, my name is Greg Hudson. I have the pleasure of representing Kinsale Insurance Company here today. The case at Barr presents a question of policy interpretation and most particularly we're here because the District Court failed to apprehend how all risk coverage forms are tailored when they are sold and designed. And in particular, what we have is a broad form all risk commercial general liability form which is modified in three ways to restrict coverage to a particular designated event. On what I've handed you, you can see the ways in which an all risk policy coverage form is limited. It has to be limited by time, has to be limited by place, it has to be limited by means. And so in the declarations page, the time limit for the policy is set for the event in question. For the place, there is a specific amendatory endorsement which changes the coverage from anywhere within the United States or a particular coverage territory to define the location of the event. And then there is a separate restriction which says that rather than the insurance policy applying to all risks or all occurrences which may trigger liability on behalf of the named insured, the risks are only those associated in this case with the maintenance, operation or use of a premises for a particular purpose. And in this case, that purpose was going to be an amateur drag race featuring amateur racers who would show up and simply hit the gas as we might say. It's a one day policy for a car race but the exclusion says no, doesn't cover anything relating to cars. That's correct. What did they get? What they got principally was something that would cover general liability issues arising from spectator issues, slip and fall type injuries, problems with concessions, things of that nature. What we did not intend to sell and the exclusions to the policy are very clear on this, we were not intending to cover the risks associated with unlicensed drag racers showing up in unregistered cars. This is not a national hot rod racing association, nobody checks these vehicles, people just show up and go. What's the venue? The venue was the Kerrville County Airport in Kerrville, Texas. So they're zooming around the runways? Most particularly they're zooming straight down the runway because it's drag racing. And as your Honor can see, unlicensed drivers just hitting the gas and speeding along, somebody lost control careening into the stands that caused the underlying injury from which this declaratory action on coverage arises. The district court focused on the footer, right, to create the ambiguity. If there is ambiguity, you owe a duty to defend at least, but you can correct me when I finish this sort of question, but I appreciate your tolerating that. I think I'm correct that this turns on whether there's ambiguity or not, and primarily the district court said, well, down there in the footer it says nothing can change the actual policy, so that seems odd as to the exclusion. Yes, Your Honor, two things. First, when you consider ambiguity and two competing interpretations, if there are two competing interpretations, you would adopt the interpretation advocated by the policyholder and then you would test that interpretation for coverage. So it's not there is ambiguity, therefore the insurance company loses. So a technical detail, but maybe important in this case. The district court focused on the endorsement which limited coverage to the means of the maintenance, operation, and use of the premises and treated that as if it was its own grant of coverage, and then said, we don't know how this grant of coverage is impacted by the remaining endorsements. That starts with a faulty premise. The endorsement which limits coverage to the maintenance, use, and operation of the premises does not grant coverage. It is not, as the appellee says, a mere restatement of what the policy intends to do. That's not a reasonable interpretation. The district court's interpretation particularly was not reasonable because if you read it as the district court did, that endorsement is not occurrence-based, it is not limited to the liability of the named insured. It just says we cover anything from maintenance, use, or operation of these premises. Does that now mean that if two drivers get in a fight that we're suddenly liable for that? Apparently it would. It would knock out not only the exclusions, it would knock out the general coverage form. It would, in its essence, use that one statement and it would obliterate a hundred other pages of a policy and Texas law says you don't get to do that. That is not a reasonable reading. It is not consistent with how anybody understands a grant of coverage. It ignores the language of the endorsement regarding modification of the form only. And then to get to Your Honor's question about the language at the end which says all other terms and conditions remain unchanged, there's no question but that the Kinsale interpretation of this form is reasonable. And this court has held in other contexts that the language, all other terms and conditions remain unchanged, merely says whatever is affected by this endorsement is limited to that effect. You don't overread the endorsement. You don't apply it to other things. The way the district court read it and the way that the appellee reads it is that's a statement that says there's nothing else changed about the policy anywhere. That is not a reasonable reading. It's not consistent with the language itself. That plain meaning which Texas focuses on does not mean that all other terms and conditions remain unchanged is somehow an implication that there's not another endorsement to the policy. It would ignore a number of things. Many of these policy endorsements are ISO promulgated. They all contain this language. There were what, 54 endorsements or something like that? Something very close. There were 54 pages I believe, but some of them were multi-paged. There were a lot of endorsements. So their reading would wipe out all of those? It would. Except the one, right? No, it would wipe out that one too because you would not know which of the endorsements was the primary endorsement. Under their reading, by saying all other terms and conditions remain unchanged, there could be but one endorsement. Which one is it? Nobody knows. Another flaw in the district court's reasoning. These are ISO forms, Insurance Services Office. They all contain this language. And several of the endorsements on this policy are required by either state or federal law. For instance, the mandatory Texas changes which provide certain information regarding claims, the Department of Insurance, et cetera. The federally required Terrorism Risk Act endorsement. Are we now saying that because we are required by law to have these endorsements on the policy which contain this very language, that we've now obliterated all of the endorsements under the policy? That is the implication. That would create absolute chaos for this court and any other court looking at an insurance policy because typically, policies are written using all risk forms which are then limited by the endorsements. To accept this argument, unreasonable on its face, unreasonable under the language, would hold that virtually every policy out there is automatically ambiguous as terms of coverage. That cannot be the result. There would be utter chaos and it would be terrible for both carriers and policyholders. It is within the exclusions and the endorsements that the all risks forms are formed. That is what forms the basis of the premiums that are paid. It's what forms the basis of the coverages that are offered or not offered. And by removing all that, it does, Your Honor, there was an $8,000 premium charged for this. Well, it was the coverage concerning the spectators for what was anticipated to be upwards of a 10,000 person attended event. So it was a fairly significant event, but that premium in no way would reflect the risks associated with amateur drivers just hitting the gas on an airport runway. But in any event, this court and the Texas Supreme Court have held that it's not really a premium and the risks match up. That's rewriting the contract. As long as there is some coverage afforded, and there clearly is, and the district court found that there was, coverage is not ambiguous. I'm going to go ahead, unless there are other questions, cede the rest of my time back. We've covered, I think, that the Kinsale interpretation is reasonable. The interpretation of the Appellee is not. Okay.  And I've saved time for rebuttal. Thank you, Mr. Hudson. Mr. Smith. Thank you, Your Honors. May it please the court. I'm John Smith. I'm proud to be here to represent my clients, Flying Diesel and Ross Dunnigan. And I'm grateful to the court for taking the time to hear this case. I wanted to start out by talking about a word that counsel didn't use in his argument, but that's used over and over in both their initial brief and the reply brief, and that term is boilerplate. I'm trying to bring an argument here that wasn't necessarily brought out in the brief, something a little bit different, not just rehash that. But it occurred to me as I was preparing for this argument that that use of the term boilerplate, they never really explain what boilerplate is, but it's just sort of a signal from Kinsale that, oh, all other terms and conditions remain the same in the policy, is a signal that this is just, this doesn't mean anything, this is just kind of here. And, but that implication is not supported by Texas law. You know, all of the rules of construction that we're all familiar with, including the ones that we look at all the words of the policy and we try to give them all meaning, we have to give them all meaning, we seek to harmonize, but when we can't harmonize, then there's the ambiguity. I looked to see if I could find any cases, I got curious, are there any cases that tell us under Texas law from Texas courts or the circuit court here, what boilerplate means, and there's just very few insurance cases that even use the word boilerplate in connection with insurance policies. There certainly aren't any that say, here's what boilerplate is, and when you see boilerplate, you know, you don't assign it any meaning. We do talk about in some cases, you know, headers and footers and so forth, and I think in one point, Kinsella refers to this as a footer. I did find one case that was out of this court that talks about something called boilerplate, and that's one of these government required forms, it was under like a common carrier case where the Texas DMV requires a form F to be attached to the policy, but it doesn't add to or subtract to coverage, it just has to be there to tell the public, this common carrier has coverage. So to be clear, the all other terms and conditions language that we're talking about, that we argued creates an ambiguity, and that the district court agreed created an ambiguity, it's part of the policy. Kinsella put it in all caps on every one of these endorsements. We have to follow those rules of construction, and as far as I know, there's not an ignore boilerplate rule of construction. Yeah, I think what he wasn't, he didn't, as you pointed out, he didn't say boilerplate up here, he didn't imply it's of no significance, he said it's just standard throughout the industry, so what are you saying, all those provisions create ambiguity? What I'm saying is I guess, here's the question, is there any case that supports that this type of footer language creates the ambiguity you say it does? What's your best case on that? The best case would be the two cases that I cited most extensively, the Pogo case out of the southern district, and then the Syracuse case, which is from out of state. Are they perfectly on all fours? No. As the court probably gathered by all the different cases that we cited, there really aren't any exactly on point. I think it's important to note, and I talk with my hands a lot, and I'm very visual, you know, there's the CGL form, the 16-page form, there are cases where courts look for and find or don't find ambiguity in the form. Believe it or not, there's policies, probably not commercial general liability policies, there are policies without endorsements, and then there are cases where there's the form and there's endorsements, and in many of the cases that can sell sites, the court is looking at, is there something in the endorsement that creates an ambiguity back to the form? And there's not enough time to talk about all the different cases that they cited, but as I said in the brief, and I'll summarize it here, all the cases that they cited about this, all other terms and conditions in the policy remain the same, do one of two things. It's either just there, and they don't really discuss it substantively, or these courts say, this means something. This means something. For example. On your ambiguity theory, what would happen to the traffic control exclusion, the bleacher exclusion? Yep, those would be gone. In this particular case, with this particular policy, where we have the 16-page CGL form, and then we have declarations that tell us, okay, here's the time frame, we've got this policy for 24 hours, and then we have this coverage for designated events, the CDE endorsement, that says, this insurance applies to this event. And I never said in my brief, it's an insuring agreement. The trial court didn't say this is an insuring agreement. We said, this CDE endorsement, it provides coverage for this event. And if you look at those three documents together, including the bottom of the endorsements that says all other terms and conditions of the policy remain the same, then it's in conflict with these massive number of exclusionary endorsements that say, it is changed. You don't have motor vehicle, anything for a motor vehicle. You don't have anything for an aircraft or a watercraft. There's nothing for grandstands. I think it might be different. Not all endorsements just say, notice, this form changes the following, the whole policy. I mean, that's what all these endorsements say. This form changes the commercial general liability form. There are cases where, in some of the cases that even Kinsell cites, where the endorsement will say something like, have a look at, they don't say that exactly, but they say something along the lines of, have a look at section 1, subparagraph B2. That definition is eliminated, and here's the new one. All other terms and conditions of the policy remain the same. So in that case, that's very clear. We took that out. We put that in. Everything else remains the same. To flip it around a little bit, if in our case, if our argument was, let's say the policy contained the absolute motor vehicle exclusion. It's in the policy. It's in the 16-page policy, the CGO form, and then we had this CDE endorsement, and I came to you and said, look, this endorsement says that this event is covered, and so that's in conflict with this exclusion for motor vehicle exclusion within the body of the policy. Well, I wouldn't be here, because the trial court wouldn't have bought that argument, because that endorsement would have said, look, this is the event that's covered. All other terms and conditions of the policy remain the same, including the motor vehicle exclusion that's in the body of the policy. Next slide, please. There's no question that the body of the policy provides for coverage. I think that's . . . the district court noted that that was the case. I've talked about Kinsell's boilerplate language, and I want to be clear. One, I would have talked about ambiguity. One other point I wanted to make on ambiguity that the district court made, which is that, and it kind of goes hand in glove with the whole notion of ambiguity and how we interpret the policies when there is one. Kinsell wrote the policy. Kinsell chose to write these exact words in all caps on all of these endorsements, and to kind of piggyback on something that counsel said, talking about all the different endorsements that are required. For example, the Form F that I was talking about, or some of these other governmentally required forms, those forms are required, but they're not required to have that language on them. Does that make sense? If I have to have something that says, you need this Form F to tell the world that the common carrier has the right amount of coverage, I have to put that in the policy, but I don't have to put something down there that says all other terms and conditions remain the same. So they don't have to use that language at all, or they could have used other language, like all other terms and conditions of the policy remain unchanged, except for changes made by the other endorsements identified in this policy's list of forms, or as the district court suggested, Kinsell could have added language that said, to the CDE endorsement that stated, it was subject to certain listed exclusions, or each exclusionary endorsement could have stated that it modified the CDE endorsement. So there's different ways that they could have worded it so that it didn't create this ambiguity. On the point of the, that if you all affirm this case, that the sky will fall and that all policies around the world will remain meaningless, I don't think that's the case. This is a pretty narrow case, as you can see by the lack of authority right on point. We're talking about conflicting endorsements with this exact language. But one of those rules . . . . . . I think I agree with you, Your Honor. We found a lot of cases that either have that exact language or very similar language that essentially means the same thing. But . . . However we deal with that language is going to have some kind of an impact on other cases. As you know, people are going to bring suit. I agree with you. And I think the way that you deal with the language is the way that all of the courts in the cases cited by Kinsel dealt with that language, which is it means something. It has meaning, which is all other terms and conditions of the policy remain the same. It's just that in all those other cases, they were interpreting that language in an endorsement versus language in the main body of the policy. And they were saying, okay . . . and bear with me, I'll grab one just to . . . so I'm not just talking out of thin air here. Let me find . . . let's see. One of the out-of-state cases that they cited was the . . . for example, the Angus case. The Angus case is kind of a simple case where it's a construction company, and they demolished a building they weren't supposed to, and it was an accident. They got instructions to do it, and then they got instructions not to do it, and in between they did it. And in that particular policy, there was a CGL form with a later endorsement that provided coverage for wrecking of buildings. But within the body of the policy, the policy said, intentional conduct is excluded. And so, Angus, the building demolisher, came to the court . . . well, he made a . . . he demolished the building. They sued him. He filed the claim. And he came to court saying, look, this endorsement that says I can . . . you know, demolishing buildings is covered, that's in conflict with this . . . this notion in the main body of the policy that intentional conduct is not covered. And the court said, no, no, no, that's not the case. It says you can demolish buildings. All of the terms and conditions of the policy remain the same, including the fact that intentional conduct is not covered in the policy. So that's an example of how most of these cases treat it. And to answer your question, Judge Smith . . . Well, where's the conflict in this one? Where's the conflict in this one? The conflict . . . In the event, but then they carve out these various exclusions. Yeah. The conflict is that the CDE endorsement says that the insurance applies to this event. And that's in conflict with all of these . . . and that all other terms and conditions of the policy remain the same. So I wasn't talking about Angus to say it's like this case. I'm talking about Angus to say that's a case where courts over and over again say this language has meaning. It really does mean that all other terms and conditions of the policy remain the same. And that's what they did in Angus, and that's what they did in Grebel, and that's what they did in Bingham, and that's what they did in most of the Texas cases cited by Kinsell. And what I'm saying is in those cases, a lot of times they used it to say . . . to disagree with the insured that there was an ambiguity. No, it doesn't create an ambiguity because that language has meaning. So if I may, I do want to spend just a little bit of time on illusory coverage, unless you all have more questions about ambiguity. So one thing I want to talk about to piggyback on the question about the premium, one of the arguments that Kinsell makes in its brief is, well, look, there's no way they could have thought they were getting coverage for this drag race. They only paid $8,300 for the premium. But let's think about that for a little bit. That's an $8,300 premium for 24 hours for a million dollars of coverage. It's not unlimited coverage. It's a million dollars worth of coverage. That's an annualized premium of over $3 million. So they say it's absurd that we would have thought we were going to get coverage for a drag race for $8,300 for 24 hours. But to me, what sounds absurd is that somebody would pay a premium that's an annualized amount of over $3 million for somebody choking on their popcorn, because remember, they talk about slip and fall. Well, as long as you don't slip and fall out of the grandstand, you know. So there's very, very little here that's possibly covered. Now, there's two things that I argue on the illusory coverage. One is that under the athletic participant's endorsement, that there's no coverage. And trial court didn't agree with me on that. But I do think it's worth a closer look. That language is extremely broad. That language says, this insurance does not apply to any claim for bodily injury arising directly or indirectly out of, related to, or in any way involving any preparation, practice or training for or participation in any contest or exhibition. And then it goes on to say, it applies regardless of whether the excluded activity is the initial precipitating cause or is in any way a cause, and regardless of whether any other actual or alleged causes contributed concurrently, and it goes on and on, arising out of a chain of events that includes any excluded activity. I don't think it's an unreasonable reading of that to say, well, Race Wars 2, the name of the event, it existed. That's why this policy was issued. That's why the people showed up. That's why there was a concession stand. It's all related to this competition. Anything related to that is excluded. I do see the irony in the fact that to argue for illusory coverage, I've got to argue that this creates virtually no coverage. But there's also, we don't have to show that there would never, ever, ever be any coverage because if this court makes an eerie guess, under Texas law, there's two Supreme Court cases that say the standard is largely illusory, and, Your Honor, I think you, Judge Higginson, you wrote an opinion, the Balfour Beatty opinion, which involved a policy for a building, and there was some, I get to say, welding slag that came down the side, the welding slag case. And in that case, you said, yeah, you may get the benefit of the largely illusory language on illusory coverage doctrine, but it doesn't help you any, because here's all these other things that could be covered. And they were serious things. They were things like a storm, or a fire, or a car running into it. This case is different. This is a liability-only policy for 24 hours for a car race. And a 24-hour policy at a $3 million-plus annualized premium for, to make sure somebody doesn't sue you for choking on popcorn or slipping and falling. That's largely illusory. In conclusion, I've got a little bit of time. You know, on behalf of Flying Diesel and Mr. Donegan, I request that you affirm the trial court's decision and find that Kinsella owes my clients the duty to defend them in the still pending underlying lawsuit. And while I've just got a minute and a half left, I would just like to say, you know, this is our business to talk about these sort of obscure insurance coverage issues. But, you know, this was a horrible accident that my client tried to insure against. The lawsuit is still pending. Three people were killed. The rest of Mr. Jones' family was all seriously injured. So this case is very important to my clients and very important to them. And I just don't want to lose sight of, you know, the actual human piece of this case. So unless you all have any questions, I'll stand down. All right. Thank you, Mr. Smith. Mr. Hudson for rebuttal. Thank you, Your Honor. I think that the appellee's argument demonstrates exactly why the Kinsella reading of the policy is in fact reasonable and the appellee's version is not. Let's start with the first point about boilerplate. At no point in time do we or this Court ever say that the language, all other terms and conditions is boilerplate and meaningless. To the contrary. That language tells you where to stop making changes to the all risk coverage form. The CBX case that we cited in our reply brief is an exemplar of this. In that case, the endorsement said make a change to the J-4 exclusion and the argument was you should also be making a change to J-5. This Court said no. That language, all other terms and conditions remain unchanged is important because it tells you where to stop making the changes. To adopt their rationale would implicitly overturn the CBX case as well as every other case that this or any other court in the district has decided based on the application of language within a multi-endorsement policy. There is no way around that and you would be doing it not on the basis of a plain meaning language reading which is critical under Texas law but because you are taking that all other terms language and reading in a way which is nonsensical. The best two cases that he can cite on this, Pogo and Syracuse, are utterly proving of our point regarding how you read this language. In both Pogo and Syracuse, the competing endorsements had language which directly conflicted with each other. Each of them purported to redefine a term within the coverage form differently and there would be no way to have simultaneously different definitions in place at the same time and therefore the Court said we cannot harmonize these endorsements with the policy. There is no such direct conflict here. And Texas law is very clear that when you read the policy, you harmonize. You do not look for artificial conflicts. If you can read everything consistently, that's what you do. And there are multiple cases all cited in our brief to exactly that effect. And yet the District Court failed to apprehend that and Apelli is arguing that you should look for a strained reading which could potentially create a conflict. That's not the law. That is not how policies are construed. And the best basis he can give for that is we think that this language means we got more. Texas law forbids that as a consideration. Texas law does not have a doctrine which gives relevance to the expectations of the insured if that was in fact their expectation. Instead, under Texas law, the intentions of the parties are gleaned from the plain meaning language that is in the contract. And the plain meaning of the contract here is that we started with an all risks form tailored to an event using three endorsements and then those certain risks associated with that event were eliminated from coverage via the following endorsements. None of this is in conflict with each other. All of these endorsements can be given effect simultaneously without conflict. That is what makes the Kinsale interpretation of the policy reasonable. I think also that the arguments about illusory coverage also demonstrate something that Texas law has said we don't do here. The argument that if you annualize this premium, well, frankly, I think a $3 million premium, if you had 10,000 people all sitting in the same stands buying food from each other every day for a year, it would probably be a pretty cheap premium. But Texas law, again, says you don't get to get under that. They did buy something for their money. That's all you need. And the Texas cases, the Balfour case and the Grain Dealers case, both of which are If there are no other questions, I'm going to end in, I hope, a slightly unusual note. My daughter is a second-year law student at Duke who was listening in, I hope, today. Sweetie, your mom and I are very proud of you, and I look forward to the day when it's you sitting here in front of the court and it's me who gets to listen in privately. Your Honors, thank you very much for your time. If there are any other questions, I'd be pleased to answer them. All right. Thank you, Mr. Hudson. In your case, and all of your cases here under submission, the court is in recess under the usual order.